# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| **PAUL FELLER, et al.,** ) | **NO.  18-cv-03460-KS** |
| **Plaintiffs,** ) | |
| **v.** ) | **AMENDED FINDINGS OF FACT AND** |
| ) | **CONCLUSIONS OF LAW FOLLOWING** |
| **ROBERT PETTY, et al.,** ) | |
| **Defendants.** ) | **BENCH TRIAL** |
| ) | |
| **AND RELATED COUNTERCLAIMS** ) | |

Pursuant to and consistent with the Court's Order of July 19, 2024, granting in part and denying part Cross-Defendants' Motion to (1) Alter or Amend Findings of Fact and Conclusions of Law Following Bench Trial and (2) Alter or Amend Amended Judgment or Alternatively, for a New Trial (dkt. no 274), the Court issues these Amended Findings of Fact and Conclusions of Law pursuant to Federal Rule of Civil Procedure 52(a).[1]

\\

\\

---

[1] The parties made no oral motions at the close of their cases-in-chief.

# I

# FINDINGS OF FACT

## The Parties

1. Plaintiff Paul Feller is an individual who resides in Santa Barbara County California.
2. Plaintiff Cronus Equity, LLC ("Cronus") is a Delaware limited liability company doing business in Santa Barbara County California.
3. Cronus is a consulting company founded and operated by Paul Feller.
4. Defendant and counterclaimant Robert Petty is an individual who resides in New Canaan Connecticut.

## Sky Digital Media Inc.

5. Robert Petty immigrated to the United States from Australia.
6. Mr. Petty obtained a degree in accounting from Swinburne Institute of Technology (Australia).
7. Mr. Petty is a self-described digital entrepreneur and has been involved with computers and technology for 30 years since arriving in the United States.
8. Mr. Petty founded RR Media, one of the founding technology groups involved in broadcasting video over Internet.  He listed RR Media on NASDAQ in approximately 2002 and ran it as a public company for about six years.
9. In 2009, Mr. Petty formed Sky Media and was CEO and Chairman.
10. In 2009, Mr. Petty founded Sky Digital Media Inc. ("Sky").
11. Mr. Petty was founder, director and shareholder of Sky.
12. Mr. Petty met Plaintiff Paul Feller in or around January 2015.

13. Sky entered into a consulting agreement with Paul Feller, whereby Mr. Feller was to be chairperson and CEO of Sky.

**VOS Digital Group, Inc. (VOS)**

14. In or around October 2015, Mr. Petty founded VOS Digital Group, Inc. ("VOS").

15. Mr. Petty hired counsel who drafted the necessary paperwork for VOS and submitted the appropriate agency filings for VOS.

16. Mr. Petty registered VOS.

17. Mr. Petty personally paid the fees associated with the creation of VOS.

18. Mr. Petty was sole owner, president, director, and shareholder in VOS.

19. Mr. Petty opened a VOS company bank account at Chase Bank.

20. As sole shareholder of VOS, Mr. Petty owned 8,500,000 shares of common stock and 2 million shares of preferred stock in VOS.

21. Each share of preferred stock in VOS had super voting rights equal to 100 times that of a share of common stock.

22. Mr. Petty first came up with the idea to acquire the assets of News Look from Zipline Media, Inc. ("Zipline").

23. VOS entered into an asset purchase agreement to acquire New Video Exchange from Zipline in exchange for 1 million shares of common stocks for a total price of $1.5 million to be paid in installments.

24. Mr. Petty negotiated the terms of the Zipline deal and then formed VOS to acquire Zipline.

25. The Zipline acquisition closed in mid to late October 2015.

26. Mr. Feller first heard of Zipline through Mr. Petty.

27. Mr. Feller first heard of VOS through Mr. Petty.

28. By the time Mr. Feller became involved with VOS, Mr. Petty had already signed the Zipline deal.

3

29. For the Zipline asset purchase, Mr. Feller and Mr. Petty discussed that each of them would initially raise $750,000 for a total of $1.5 million and then an additional $1.5 million of working capital.

30. Mr. Feller, through his company Cronus, agreed to be involved with VOS by raising capital in exchange for shares in VOS.

31. Mr. Feller, through Cronus, would raise capital for VOS on a best-efforts basis.

32. Mr. Feller and Mr. Petty had a 50/50 agreement on VOS.

**Mr. Petty Appoints Mr. Feller to VOS Board of Directors**

33. In October 2015, Mr. Petty, as sole director of VOS, appointed Mr. Feller to the Board of Directors to help raise capital.

34. During the period of October 2015 through December 2, 2015, the only persons serving on the VOS board of Directors were Mr. Feller and Mr. Petty.

35. At a VOS board meeting in December 2015 attended by Mr. Feller, Mr. Petty, and corporate counsel, stock was authorized to be issued to Cronus Equity, Mr. Feller's consulting company.

36. The VOS Board of Directors authorized 4,250,000 shares of common stock and 1 million shares of preferred stock to be issued to Cronus Equity.

37. Mr. Feller testified that, despite the 50/50 agreement, Mr. Petty had no ownership share in VOS because no shares were issued to Mr. Petty by the board of directors.

38. Mr. Feller maintains that between October 2015 and December 2, 2015, VOS had no shareholders.

39. In 2015-2017, Mr. Feller was a VOS director and full time CEO of Sky Digital Media.

\\
\\
\\

4

**VOS Private Placement Memoranda**

40. The Private Placement Memorandum ("PPM") for the 2016 VOS capital raise listed the offering price for VOS Digital shares as $1.00 per share.

41. The PPM for the VOS share offering lists Mr. Petty or appointees as the owner of 4,250,00 shares and as owner of 1 million shares of preferred stock on August 2, 2016.

42. The value of the shares owned by Cronus at the time of Mr. Feller's bankruptcy was at least $525,000 based on a one dollar per share offering price.

43. At the time of the VOS capital raise, Mr. Feller was an equity holder of Cronus and a shareholder of VOS.

**Feller/Cronus Consulting Agreement for VOS Capital Raise**

44. Mr. Feller testified that he was engaged to raise capital for VOS pursuant to a written consulting agreement between VOS and Cronus.

45. In 2015 Mr. Petty was the sole director of VOS and did not sign the consulting agreement.

46. The Cronus/Feller consulting agreement was not disclosed in the August 2, 2016 PPM.

47. Mr. Feller gave potential investors the VOS PPM without disclosing to them that he, through Cronus, was getting an 8% cut of the capital raised.

48. In a deposition given in May 2018 in connection with a New York civil lawsuit, when asked about any written agreements between Cronus and Robert Petty relating to Zipline or VOS, Mr. Feller did not disclose that Mr. Feller personally and/or Cronus had any written consulting agreement with VOS.

49. In 2017, Mr. Feller resigned as CEO of Sky and resigned from the Sky Board of directors in February or March 2018.

5

50. In June 2020, Sky was acquired by ICARO Media Group, previously known as VOS.

51. All of the shareholders of Sky were merged into shareholders of ICARO.

52. As a result of the ICARO/Sky merger, Mr. Petty obtained stock in ICARO.

**Feller/Cronus Seize Control of VOS Funds**

53. The VOS PPM directed potential investors to wire their investment funds to Cronus Equity LLC.

54. Mr. Feller deposited VOS investment proceeds from the sale of VOS shares into a Cronus bank account.

55. Mr. Petty did not agree to have VOS funds held by Cronus.

56. The proceeds from the sale of VOS shares to investors should have been deposited into an escrow account held and managed by VOS's counsel.

57. Dr. Christopher Virtue, an ICARO shareholder and investor, made a $200,000 investment in VOS and those funds were initially deposited in VOS's account at Chase Bank because the funds belonged to VOS.

58. A few days after the funds were deposited in VOS's bank account, Mr. Feller initiated a transfer of $175,000 from the VOS bank account into Cronus's account.

59. Mr. Feller did not recall whether or not he told Mr. Petty about the $175,000 transfer from the VOS bank account to Cronus at the time.

60. At the time Mr. Feller initiated the $175,000 transfer from VOS's bank account back to Cronus, Mr. Petty was still a member of the VOS board of directors and was President of VOS.

61. If Mr. Feller had not wired the $175,000 from the VOS bank account to Cronus, VOS would have had almost $200,000 in its account rather than the $12,000 balance reflected as the ending balance on VOS's Chase bank statement for February 1 through February 20, 2018.

6

62. In February 2018, Mr. Petty objected to the $175,000 transfer from VOS's Chase account to Cronus Equity.

63. Mr. Virtue later directed Mr. Feller to move the balance of Virtue's investment from VOS to Cronus's account for safekeeping.

64. The Cronus bank account was used to accept subscription money from VOS investors from approximately October 2015 until March 2018, when Mr. Petty was terminated as an officer of the company.

65. An email dated February 12, 2018, purporting to give Mr. Feller the authority to transfer $175,000 from Chris Virtue of the $200,000 Mr. Virtue invested in VOS was sent to the email address paul.feller@vosdmg.com.

66. Credible evidence established that the domain "vosdmg.com" was not created until March 28, 2018.

67. Mr. Feller signed a $50,000 secured promissory note from Cronus Equity LLC to VOS Digital Group, Inc. on October 12, 2015.

68. Mr. Feller signed the $50,000 promissory note on behalf of VOS Digital Inc. and was still a member of Cronus Equity LLC on October 12, 2015.

69. As of November 12, 2015, Mr. Feller did not disclose the terms of the promissory note to Mr. Petty.

70. The security agreement granted Cronus a security interest in all the assets of VOS. This was not disclosed to Mr. Petty at the time in November 2015.

71. Cronus wired $50,000 into a VOS account at Chase Bank on or about November 12, 2015 and the source of the $50,000 was an investor, George Shirey.

72. A December 1, 2015 deposit of $400,000 wired into the Cronus Equity LLC bank account for VOS, as reflected on the Cronus Equity LLC bank statement for December 1 through December 31, 2015, also came from Shirey.

73. The VOS bank statement on December 31, 2015, showed a negative balance, even though Cronus was holding at least $400,00 in its account for the benefit of VOS.

74. In addition to the $400,000 that Cronus received in December 2015, Cronus also received $500,000 from investors for the purchase of VOS Digital Securities in November 2015.

75. Cronus did not forward the $500,000 into the VOS Chase bank account in November 2015.

76. The Shireys paid $450,000 to purchase securities in VOS.

77. Mr. Feller acknowledged that Cronus was holding $900,000 of investments in VOS Digital securities in late 2015 and these funds would have relieved financial pressure VOS was experiencing at the time.

78. Despite Cronus having received $900,000 from investors for the purchase of VOS Digital shares in late 2015, Mr. Feller signed secured demand notes for loans from Cronus Equity to VOS in the amounts of:

   a. $30,000 dated October 29, 2015 (Note #2) Def's Ex. 9;

   b. $35,000 dated January 12, 2016 (Note #3) Def's Ex. 10;

   c. $29,500 dated February 2, 2016 (Note #4) Def's Ex. 11;

   d. $28,500 dated February 18, 2016 (Note #5) Def's Ex. 12;

   e. $36,000 dated February 29, 2016 (Note #6) Def's Ex. 13;

   f. $38,000 dated March 15, 2016 (Note #7) Def's Ex. 14;

   g. $38,000 dated April 5, 2016 (Note # 8) Def's Ex. 15;

   h. $38,000 dated April 14, 2016 (Note # 9) Def's Ex. 16;

   i. $37,500 dated April 20, 2016 (Note # 10) Def's Ex. 17;

   j. $37,800 dated May 13, 2016 (Note #11) Def's Ex. 18;

   k. $106,200 dated June 30, 2016 (Note #12) Def's Ex. 19.

79. The funds for each of these secured demand notes were wired by Cronus to VOS and treated as an obligation of VOS to Cronus Equity.

80. The total amount of the twelve promissory notes reflects $504,506 that VOS would owe Cronus.

81. The Cronus bank statement for the period July 30, 2016, through August 31, 2016, reflects a deposit of $100,000, dated August 10, 2016, for Brian Giammeralla's investment in VOS that was deposited into the Cronus Equity account.

82. The Cronus bank statement for September 1, 2017, through September 29, 2017, reflects B.O. Patel's $56,000 investment in VOS.

83. The Cronus bank statement for November 1, 2017, through November 30, 2017, reflects Joseph Scott Giammeralla's $25,000 investment in VOS.

84. The Cronus bank statement for December 1, 2017, through December 29, 2017, reflects Brian Giammeralla's $25,000 investment in VOS.

85. Mr. Petty reported his concerns about the unauthorized VOS share sales and the fact that $1.8 million of VOS investment money had been paid to Cronus to the Securities and Exchange Commission ("SEC") and Federal Bureau of Investigation ("FBI").

86. Mr. Petty told Brian Giammeralla that Mr. Feller was stealing money from VOS and funneling it into Cronus and Mr. Giammeralla believed it at the time.

87. Mr. Petty felt it was his fiduciary duty as an officer and director to report this information to the appropriate bodies.

88. All of the persons that Mr. Petty bcc'd on the email communications about his investigation were individuals directly involved with VOS either as shareholders, officers, or as counsel.

89. Mr. Petty never approved changing the instructions in March 2018 for investors from sending funds to Pryor Cashman escrow account, the company's lawyer, to Cronus Equity.

90. Mr. Petty never approved money from VOS investors going to Cronus Equity LLC.

91. Credible testimony established that standard corporate practice is that investor money is held in a lawyer's escrow account for the company to draw down as

needed.  It is never held in a private account, particularly where investors are involved.

92. $1.85 million of VOS investor funds deposited into Cronus's bank account did not comport with required corporate formalities: VOS had no record of the funds and these moneys were not reported in financial accounts from October 2015 through April 2018.

93. VOS has no record of subscription agreements and no knowledge that these shares were being sold; there is no board resolution recognizing the money; and the money was not deposited in the VOS company bank account.

94. As of the time of trial, Cronus Equity owns 1 million preferred VOS shares and 4,250,000 common VOS shares and VOS is preparing to go public.

**Mr. Feller Squeezes Mr. Petty Out of VOS**

95. A board resolution dated March 20, 2018, resolved that Mr. Petty, the VOS founder, was neither an officer nor employed by VOS digital group.

96. The VOS board resolved that Mr. Petty was not authorized to communicate to and with the company's shareholders and was to discontinue all communications to shareholders or representatives of the company as a representative of VOS.

97. On March 28, 2018, Mr. Feller sent a termination letter to Mr. Petty terminating him from employment and/or any consultancy position with VOS.

98. In 2018, after his termination, Mr. Petty, as a single director, attempted to call a board of directors meeting.

99. Mr. Petty also attempted to call for an annual shareholders meeting.

100.     Mr. Feller, with corporate counsel, notified Mr. Petty to cease and desist these efforts, because Mr. Petty had no authority to call these meetings.

101.     Mr. Feller is currently the chair of VOS with shares that he values at $3 per share and his company Cronus owns $15 million worth of VOS shares.

102.    Mr. Feller introduced no board minutes or other corporate records pertaining to the December 12, 2015 initial board meeting to confirm that Cronus was issued stock but Mr. Petty was not.

**Mr. Feller Sells 2.5 Million of Mr. Petty's VOS Shares**

103.    In November 2020, Mr. Petty was the owner of 1 million preference shares and 325,000 common shares, based on the initial agreement between Mr. Feller and Mr. Petty to set up VOS.

104.    Mr. Petty, in need of cash for personal reasons, asked Mr. Feller to sell one million shares of Mr. Petty's common stock in VOS.

105.    At Mr. Petty's request, Mr. Feller arranged the sale of Mr. Petty's shares in a private transaction for $0.10 per share.

106.    In or around August 7, 2017, Brian Giammarella, an ICARO shareholder, through his investment company Peleton Funding, purchased 500,000 of Mr. Petty's VOS common shares in a private sale of stock.

107.    Mr. Giammarella understood that Mr. Petty asked Mr. Feller to sell some of Mr. Petty's shares because of a personal financial situation and Mr. Feller asked Mr. Giammarella if he was interested in buying some of Mr. Petty's shares.

108.    Mr. Giammarella asked if Mr. Petty was interested in selling 2 million shares versus 1 million and understood that Mr. Petty only wanted to sell 1 million shares and would not agree to sell 2 million shares.

109.    When Mr. Giammarella and his family first bought Mr. Petty's shares, it was Mr. Giammarella's understanding that Mr. Petty owned the shares.

110.    Joseph Giammarella purchased 500,000 of Mr. Petty's VOS common shares in a private sale of stock.  [Ex. 63.]

111.    Mark Stein, a shareholder of VOS, purchased 500,000 of Mr. Petty's VOS common shares in a private sale of stock.  [Ex. 66.]

11

112.    Mr. Giammarella forwarded the Marc Stein stock transfer agreement to Mr. Petty and Mr. Petty was shocked.

113.    Mr. Petty received no money for this sale and found no evidence of an email chain indicating Mr. Petty ever signed the Marc Stein stock transfer agreement.

114.    Mr. Petty believes his signature was copied or pasted onto the Stein stock transfer document.

115.    Victoria Giammeralla, Mr. Giammarella's mother, made a private purchase of 250,000 of Mr. Petty's VOS shares.  [Ex. 67.]

116.    Mr. Feller says Mr. Petty sent Mr. Feller his signature on the Victoria Giammeralla stock transfer agreement.

117.    Mr. Petty did not approve or sign the stock transfer agreement with Victoria Giammeralla and was not paid for this sale.

118.    In March 2015, Ms. Rita Gatta, Brian Giamarella's aunt, purchased 250,000 of Mr. Petty's VOS shares in a private sale of stock.

119.    Mr. Feller says Mr. Petty sent Mr. Feller his signature on the Gatta stock transfer agreement.

120.    Mr. Petty did not approve or sign the stock transfer agreement with Rita Gatta and was not paid for this sale.

121.    Dhrin Patell purchased 500,000 of Mr. Petty's VOS shares.  [Ex. 68.]

122.    Mr. Feller says Mr. Petty sent Mr. Feller his signature on the Stein stock transfer agreement.

123.    With respect to the share purchases by Victoria Giammerella and Rita Gatta, Giammarella relayed their interest in the purchases to Mr. Feller and did not speak directly to Mr. Petty.

124.    Mr. Feller did not get any written authorization from Mr. Petty directing Mr. Feller to sell 2.5 million shares of Mr. Petty's VOS stock.

125.    Mr. Feller sent Mr. Petty two stock certificates, each for 500,000 shares, that Mr. Petty signed in August 2017.

126.    Mr. Petty only signed two agreements and both were made out to the same name, JSG Ventures LLC, each for 500,000 shares, for a total of 1 million shares. But the two agreements were signed separately.

127.    On August 8, 2018, Mr. Petty sent two signed agreements back as attachments to a single email.

128.    Mr. Petty did not authorize any other stock transfer agreements for the sale of his VOS common shares.

129.    The only agreement between Mr. Petty and Mr. Feller about the sale of Mr. Petty's 1 million VOS shares was a verbal agreement that Mr. Feller would sell the shares and receive a ten percent commission, $10,000.  Mr. Petty would get paid $90,000.

130.    Mr. Feller was paid the $10,000 commission and Mr. Petty received two payments of $45,000.

131.    In March 2018, Mr. Petty learned from Giammarella that Mr. Feller had sold 2.5 million of Mr. Petty's VOS shares.

132.    Mr. Petty only signed two stock transfer certificates for a total sale of 1 million VOS common shares.  Mr. Petty testified his signature was "replicated" or forged on two additional stock transfer agreements.

133.    Mr. Petty did not send four stock agreements to Mr. Feller.

134.    Mr. Petty did not receive any money for the sales other than the 1 million shares he specifically approved.

135.    Mr. Petty trusted and relied upon Mr. Feller to only sell 1 million of Mr. Petty's shares.

\\
\\
\\
\\

**Mr. Petty Raises the Alarm About Mr. Feller's Actions**

136.    In April 2018, Mr. Petty sent a series of email communications to Mr. Feller stating that he had sent information to the SEC and FBI.

137.    On April 24, 2018, Mr. Feller was neither an officer nor director of VOS.

138.    Mr. Feller received a notice of a board meeting held on May 14, 2018.

139.    Mr. Feller did not attend the board meeting held on May 14, 2018.

140.    Mr. Feller informed Mr. Petty that the May 14, 2018 meeting was unlawful.

141.    In Mr. Feller's view, Mr. Petty was neither Chairman nor CEO in May 2018 because the board of directors had fired Mr. Petty.

142.    Mr. Petty sent a May 21, 2018 email to a significant VOS shareholder, Jeffrey Joseph, stating that Mr. Feller was no longer an officer or director of Sky.

143.    On May 21, 2018, Mr. Feller was not an officer or director of Sky.

144.    Mr. Petty had shown Giammarella bank statements that showed money coming into the VOS bank account and going back out to Cronus Equity, a company that Mr. Feller controls.

145.    Mr. Petty told Mr. Giammarella that Mr. Feller was stealing money from VOS and funneling it into Cronus and Mr. Giammarella believed it at the time.

146.    Minutes of a May 14, 2018 VOS board meeting indicate Robert Petty chaired the meeting, acted as Secretary, and requested that he be elected as Chairman, CEO, President, AND Treasurer of VOS effective immediately.

147.    At an April 18, 2018 board meeting, Mr. Petty read the board a prepared statement that covered the $175,000 that was withdrawn from the VOS account after receipt of the check from Christopher Virtue, the approximately $1.8 million in investor funds.

148.    The VOS Board of Directors removed Paul Feller from the VOS Chase Bank account and authorized Mr. Petty to set up a new bank account and be the sole signatory to the new account.

14

**Mr. Feller Resigns From Telecentris Due to Threatened Legal Action by Mr. Petty**

149.     Mr. Feller served on the board of directors of Telecentris, an IP phone system and technology company, for approximately three-and-a-half years.

150.     Mr. Feller's compensation agreement to be on the board of directors with Telecentris provided for Mr. Feller to receive a million shares of the company stock earned over three years with automatic renewals.

151.     Mr. Feller was contacted by Mr. Brian Hertz, a member of the Sky board, who informed Mr. Feller that Mr. Petty had notified Brian Giammeralla and Mark Stein that Mr. Petty had threatened legal action against the Telecentris board of directors unless Mr. Feller was removed.

152.     In March or April 2018, after the communication by Mr. Hertz, Mr. Feller resigned from the Telecentris board of directors and released his compensation of the Telecentris shares as part of the settlement.

153.     At the time Mr. Feller resigned from the Telecentris board of directors, he had earned a million shares that vested up until that point.

154.     Mr. Feller believes a million shares of Telecentris common stock was work approximately $3 million on July 15, 2014.

155.     On January 1, 2015, Mr. Feller commenced providing consulting services to Telecentris and also remained on the board of directors, as the appointee and acting on behalf of Cronus Equity.

156.      The consulting agreement with Telecentris provided for compensation to Cronus Equity of $10,000 per month, with a term of 12 months annual auto renewal unless 90 days written notice was provided.

157.     The Cronus/Telecentris consulting agreement renewed at least 3 to 4 times until Mr. Feller resigned.

158.    Mr. Feller understood that the reason he was terminated was due to concern of the Telecentris board and company of being sued as a result of statements made to Telecentris by Mr. Petty.

159.    Cronus Equity was paid $10,000 a month each and every month while the consulting contract was enforced.

**Mr. Feller Resigns as Sky Media CEO**

160.    From January 2015 through December 2017, Mr. Feller had a consulting contract with Sky Media (previously known as Sport 195).

161.    The Sky Media consulting contract provided for compensation of $7,500 per month.

162.    Mr. Feller received a couple of payments under the Sky Media consulting contract between January 2015 and January 2017 with an understanding that any accrued balance would be paid when the company completed larger funding.

163.    The Sky Media consulting agreement came to an end in late 2017 or the beginning of 2018.

164.    Mr. Feller was asked to resign as CEO of Sky Digital Media Group due to Mr. Petty and others threatening to sue the board of directors if Mr. Feller was not removed.

165.    Mr. Feller's termination as CEO, which included the consulting agreement, was discussed at a Sky board meeting that Mr. Feller did not have an opportunity to attend.

**VOS PPM Confirms Mr. Petty's Ownership of VOS Shares**

166.    As of January 1, 2017, a VOS private placement memorandum reflected that Mr. Petty owned common stock and preferred stock.  [Ex. 345.]

16

167.     According to Mr. Feller, the company continued to account for Mr. Petty's shares of both kinds of stock even though they were never authorized or issued by the board of directors.

168.     Mr. Feller was involved in drafting the PPM for the VOS capital raise.

169.     Neither Mr. Feller nor Cronus are members of FINRA, the financial industry regulatory authority.

170.     Mr. Feller is not a broker dealer.

171.     The VOS Inc. consulting agreement with Paul Feller/Cronus Equity dated October 2015 provided for Mr. Feller/Cronus to receive an eight percent "finder's fee" on raising capital for VOS from investors.  [Ex. 21.]

172.     The PPM did not disclose that Mr. Feller was collecting a finder's fee for the capital raise.

173.     Mr. Feller never actually charged VOS Digital an 8% finder's fee on any sale of any VOS stock.

**Mr. Feller Accused of Fraud in 2012 and Resigns from Stratus Media**

174.     Mr. Feller was Chairman and CEO of Stratus Media Group from 2008 through 2012.

175.      In a March 2012 10Q, the board of directors of Stratus reported that it conducted an investigation and determined that, in December 2010, Mr. Feller sold 2.5 million shares of their stock to outside investors and retained $640,000 in proceeds.

176.     Stratus Media Group reported a receivable of $640,000 from Mr. Feller in connection with European transactions.

177.     Stratus Media Group, in its 10Q filing, accused Mr. Feller of keeping in his possession a vintage automobile valued at $38,000.

178.    Mr. Feller attended, but did not graduate from, Purdue University.  In 2011, fifteen Stratus Media Group shareholders accused Mr. Feller of misrepresenting that he graduated from Purdue University.

179.    Mr. Feller resigned from Stratus Media Group on June 28, 2012.

180.    The Stratus Media Group legal claim is the subject of current litigation.

181.    By the time Mr. Feller filed the instant lawsuit against Mr. Petty, at least one company, Stratus Media Group, had made an accusation against Mr. Feller related to fraudulent conduct in connection with selling stock and taking money.

**Mr. Feller's Personal Bankruptcy Proceedings, Incomplete Disclosures, and Other Lawsuits**

182.    In February 2016, Mr. Feller filed for personal bankruptcy.

183.    Mr. Feller's 2016 bankruptcy filing reflected that he had an ownership interest in Cronus at the time and owned 4,250,000 shares of common stock in VOS and 1 million shares of preferred stock in VOS.

184.    On the 2016 bankruptcy filing, Mr. Feller did not list his role as an officer or director VOS or Cronus.

185.    Mr. Feller did not list Telecentris on the 2016 bankruptcy filing as a company where he served as officer or director of a corporation despite having 66,667 vested shares in Telecentris pursuant to the July 2014 offer letter.

186.    Mr. Feller filed an amended bankruptcy schedule signed on September 20, 2016.

187.    Mr. Feller also did not list any shares of stock in VOS Digital or Telecentris on his amended bankruptcy schedule.

188.    In the bankruptcy proceedings, Mr. Feller's ex-wife accused him of filing a bankruptcy petition in bad faith to avoid paying child support and the bankruptcy court subsequently ruled that Mr. Feller's bankruptcy filing was made in bad faith.

18

189.     Mr. Feller acknowledged that on his bankruptcy filing where it asked if he was a member of a limited liability partnership, he did not list Cronus, although Cronus Equity is a limited liability company.

190.     Mr. Feller also did not list Sky Media Group on his bankruptcy filing; did not disclose that he was an officer and director of Telecentris; did not list all of his shares in VOS Digital group; and did not disclose that he was an officer and director of VOS Digital Group.

191.     Mr. Feller testified that he did not list any interests in Sky Digital Media because he did not hold the shares personally, but those shares were owned by Cronus Equity.

192.     Feller admits he made "errors" on two bankruptcy schedules, for July 2016 and September 2016.

193.     In 2019, Mr. Feller's bankruptcy was converted from Chapter 11 to 7.

194.     ICARO Media, previously known as VOS Digital Media Group, has a lawsuit pending in Nevada against Mr. Petty.

**Evidence of Altered Email re: Cronus Consulting Agreement**

195.     An email dated October 13, 2018, from Paul Feller at Cronus Equity.com, and admitted as Exhibit 23, refers to 50/50 equity between Mr. Feller and VOS and Cronus prior to any expenses or new equity.

196.     Exhibit 23 contains some, but not all of the same content as an email dated October 13, 2015, that was filed as Document 261-1 in the Nevada lawsuit on July 27, 2018 (the "Nevada Email").

197.     The response from Robert Petty in Exhibit 23 is the same as the response from Robert Petty in the Nevada Email.

198.     The email identified at Exhibit 23 (dated October 13, 2018) contains five bulleted deal points.

19

199.    The Nevada Email (dated October 13, 2015) has four bullet points.

200.    In the email identified at Exhibit 23, deal point number three states that Mr. Feller agrees to the Cronus Consulting Agreement terms.

201.    The Nevada Email did not include any term stating that Mr. Petty agreed to the terms of the Cronus Consulting Agreement.

202.    Mr. Feller sent the email to Mr. Petty in Exhibit 23 and confirmed that Mr. Petty would not send the email on Mr. Feller's behalf.

203.    When asked, on cross-examination, whether one of these emails is fabricated, Mr. Feller acknowledged that "there is something incorrect about one of the emails."

204.    Mr. Feller acknowledged that the Exhibit 23 email "does look altered."

**Mr. Petty's Role as a Fiduciary to VOS Digital Media**

205.    In February 2018, Mr. Petty was an officer and/or director of VOS, and as such, had a fiduciary duty to VOS.

206.    In March 2018, Mr. Feller authorized Mr. Kaeder, Plaintiffs' counsel in this action, to send Mr. Feller a letter dated March 20, 2018, noting that Mr. Feller retained Mr. Kaeder as counsel to both Sky Digital Media Group and VOS.

207.    VOS is paying the litigation expenses of this lawsuit.

208.    Mr. Feller personally owns no shares of VOS today.  Cronus Equity owns 1 million shares of preferred stock and 4,250,000 shares of VOS common stock.

209.    At $3.00 per share, the value of the common stock that Cronus owns is over $12 million, if there was a public market for these shares.  The VOS preferred stock is worth at least $3 per share, equal to common stock.  The total value of the common and preferred VOS shares held by Cronus in VOS Digital is $15 million.

210.    Mr. Petty confirms he only signed stock transfer agreements for the sale of 1 million shares.  He did not sign stock transfer agreements for an additional 1.5 million shares.

**Testimony of VOS/ICARO Insiders**

211.    Louis Goldner was an investor in Sports 195 that became Sky Digital Media and is currently the Chief Operating Officer and a director of ICARO Media Group.

212.    Mr. Goldner reports to Mr. Feller at ICARO.

213.    Mr. Goldner only started working for VOS after the 2018 merger of VOS and Sky Digital Media and the name change to ICARO Media Group (ICARO).

214.    Mr. Goldner owns between 4 million and 5 million common shares of ICARO.

215.    In 2018, Mr. Goldner attended a meeting where the board members considered merging VOS and Sky Digital Media Group.

216.    Following that meeting, Mr. Goldner received a call from Mr. Petty who stated that stated Mr. Feller had entered into some wrongdoing and that Mr. Petty had informed the FBI and other authorities, and threatened to have Mr. Goldner's family deported from the United States.

217.    Mr. Bob Baumer, an investment banker who met Mr. Petty in 2016 and Mr. Feller in 2015, helped raise $4.5 million for Sport 195 from individual investors and then another $5 million for Sport 195 also from individual investors.

218.    The investors through whom Mr. Baumer raised money for Sport 195 are also his clients in other investments.

219.    Mr. Baumer had between 30 to 35 clients that invested in Sport 195 before it became Sky Digital Media, which then became VOS.

220.    Mr. Baumer's firm considered numerous emails that Mr. Petty had sent out and felt Mr. Petty's accusations were not credible.

221.    Mr. Baumer has been the subject of close to a dozen complaints with FINRA involving allegations of breach of fiduciary duty, negligence, and advice concerning risk investment.

222.    Mr. Baumer acknowledged that his clients would benefit if Mr. Feller prevailed in this lawsuit.

223.    Brian Giammarella has worked for himself in real estate investments since 2009 and holds active licenses from FINRA.

224.    In March 2015, prior to any direct investment in VOS, Mr. Giammarella purchased 1 million shares of Sport 195 directly from Mr. Petty at $0.15 per share and wired the funds to Cronus.

225.    Mr. Petty showed Mr. Giammarella bank statements that reflected money had come into the VOS account and then went back to Mr. Feller's Cronus account.

226.    In 2017, Mr. Giammarella again invested in VOS.

227.    Effective May 8, 2018, Mr. Giammarella and Mark Stein became VOS board members and the bylaws were amended to expand the number of seats on the VOS board of directors from three to five.

228.    In February 2020, Mr. Giammarella met with Mr. Feller in New York City and changed his mind about whether Mr. Feller had stolen investor money from VOS.

229.    Mr. Giammarella and Mr. Feller are business partners through Cronus Capital Investments.

230.    Rita Gatta, Mr. Giammarella's aunt, invested in Telecentris at $2 per share.

231.    Mark Stein, through his group Starlight Partners, invested in Telecentris at $3 per share.

232.    VOS sued Zipline because VOS had defaulted on payment of part of the promissory note.  In 2016, VOS and Zipline settled the dispute.

233.    Valued at $3 per share, the 1.5 million unauthorized shares of Mr. Petty's VOS sold to investors would be worth $5.4 million today if Mr. Petty had them.

**Testimony re: Value of Mr. Petty's Shares**

234.    Mr. Petty's 8.5 million founder shares represent roughly 89% of the outstanding common shares and 2 million preference shares as of August 10, 2016.

235.    Mr. Petty has incurred $300,000 in legal fees to date and believes VOS owes him $390,000.  With the Sky merger, Mr. Petty believes he is owed well over a million dollars including loans and fees from the past.

236.    The estimated value of the unauthorized sale of the common shares is somewhere in the range of $23 million to $24 million according to the articles of association.  If Mr. Petty's preference shares are converted to common shares, his 1 million preference shares convert to 4 million common shares, and using the $3 per share value testified to by Mr. Feller, that would be $12 million.

237.    Mr. Petty sold 500,000 shares of common stock to JSG Ventures for $.10 per share in August 2017.

238.    Mr. Petty authorized a sale of 500,000 shares to JSG Ventures as reflected in board minutes for a meeting on May 14, 2018.  These shares were listed at $.10 per share and the transaction with JSG Ventures occurred in August 2018.

239.    Mr. Petty's ex-wife currently holds 3.7 million shares of VOS common stock.

240.    Neither party presented any expert testimony or other economic analysis of current valuation of the shares of any of the closely held companies at issue in this case.

**II**

**CONCLUSIONS OF LAW**

This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(1).  Venue is proper in the Central District of California pursuant to 28 U.S.C. § 1391(b)(2).

**Plaintiff's Claims**

**Defamation**

1.  To prevail on a defamation claim regarding a matter of private concern, Plaintiff must establish the following elements: (1) the defendant made the statement to persons other than the plaintiff;  (2) those persons reasonably understood the statement as being about the plaintiff; (3) the statement tended to injure the plaintiff in respect to his or her office, profession, trade, or business; and (4) the defendant failed to use reasonable care to determine the truth or falsity of the statement.  California Civil Jury Instruction, CACI No. 1704.

2.  The evidence supports a finding that Mr. Petty made statements concerning Mr. Feller to persons other than Mr. Feller, including shareholders and directors of VOS, as well as the SEC and the FBI.

3.  Proof of a statement's truth is an affirmative defense to defamation.  A defendant need not prove that the statement was true in every detail, only that it was substantially true. Judicial Counsel of California Civil Jury Instructions (2011) CACI No. 1720; *and see GetFugu, Inc., v. Patton Boggs LLP*, 220 Cal. App. 4th 141, 154 (2013) (noting "California law permits the defense of substantial truth and would absolve a defendant even if she cannot 'justify every word of the alleged defamatory matter; it is sufficient

if the substance of the charge be proved true, irrespective of slight inaccuracy in the details.'") (internal citation omitted).

4. Based on the totality of the evidence, the Court concludes that statements Mr. Petty made regarding Mr. Feller's conduct in selling unauthorized shares of Mr. Petty's VOS shares, that Cronus Equity LLC improperly held funds specifically contributed to VOS and then created sham loans from Cronus Equity LLC back to VOS, were not false. Accordingly, Mr. Petty's statements were not defamatory.

5. Defendant and counterclaimant Mr. Petty has established an affirmative defense of truth. The evidence establishes the essential truth of Mr. Petty's statements regarding Mr. Feller's conduct.

6. Mr. Feller also failed to establish the fourth element of his claim for defamation. By making an investigation and basing his statements on his personal knowledge, Mr. Petty exercised reasonable care in determining the truth of his statements regarding the funneling of VOS funds into Cronus Equity LLC accounts. Further, trial evidence established that Mr. Petty only made his statements to individuals who were board members, directors, and/or investors in VOS, and therefore had a direct personal interest in the state of VOS's finances.

7. Based on the totality of the evidence admitted at trial, the Court concludes that Mr. Feller failed to prove a prima facia case of defamation and Mr. Petty has established an affirmative defense to liability.

8. Accordingly, Mr. Petty is entitled to have judgment entered in his favor on Plaintiffs' defamation claim.

**Civil Extortion**

9. Plaintiffs Mr. Feller/Cronus assert liability for civil extortion based on violations of California Penal Code sections 518, 519, 523, and 660. (First Am. Comp. at ¶ 26.) As an initial matter, Plaintiffs cannot establish liability for criminal acts in this civil action.

However, in this diversity action, California law controls and at least some California authorities "appear to assume without discussion that a civil extortion claim may be asserted under California law." *Intermarketing Media, LLC v. Barlow*, Case No. 8:20-00889-JLS (DFMx), 2021 WL 5990190, at *11 (C.D. Cal. May 4, 2021) (internal citations omitted). At least one often-cited California Court of Appeal decision has held that the California Supreme Court "has recognized a cause of action for the recovery of money obtained by the wrongful threat of criminal or civil prosecution." *Furhman v. California Satellite Systems*, 179 Cal. App. 3d 408, 425-26 (1986) (*overruled on other grounds by Silberg v. Anderson*, 50 Cal. 3d 205 (1990)). *Fuhrman* went to on to reason that an extortion claim is "essentially a cause of action for moneys obtained by duress, a form of fraud." *Id.* at 425-26. Further, *Furhman* required that the plaintiff allege the defendant knew their claims were false and that the plaintiff allege damages.

10. Here, the trial evidence did not establish that Mr. Petty knew his threats to report Mr. Feller's wrongdoing in connection with VOS funds and the unauthorized sale of Mr. Petty's VOS shares were false. To the contrary, the Court found credible the evidence demonstrating that Mr. Petty's concerns were true and his actions to alert board members and/or investors were appropriate in light of Mr. Petty's fiduciary obligations. Therefore, Plaintiffs fail on the first prong of the civil extortion claim.

11. Accordingly, Mr. Petty is entitled to have judgment entered in his favor on Plaintiffs' claim for civil extortion.

**Intentional Interference with Contractual Relations**

12. To prevail on a claim for intentional interference with contractual relations, Plaintiffs had to show (1) the existence of a valid contract between the Plaintiffs and a third party; (2) Defendant's knowledge of the contract; (3) Defendant's intentional acts designed to induce a breach or to disrupt the contractual relationship; (4) actual breach or disruption of the contractual relationship; and (5) resulting damages. *Reeves v. Hanlon*, 33 Cal.

26

4th 1140, 1148 (2004) (*citing Quelimane Co., v. Stewart Title Guaranty Co*. 19 Cal. 4th 26, 56 (1998)).

13. California law recognizes the defenses of justification and privilege with respect to the tort of interference with contract. *SIC Metals, Inc. v. Hyundai Steel Co.*, 442 F. Supp. 3d 1251, 1256 (C.D. Cal. 2020) (internal citation omitted). Where a "defendant's 'conduct was lawful and undertaken to enforce its rights,' it cannot be held liable for intentional interference with a contract even if it knew that such conduct might interrupt a third party's contract." *Id.*; *and see Quelimane Co.*, 19 Cal. 4th at 56.

### *Telecentris Consulting Agreement*

14. The evidence established that Mr. Feller served on the board of directors of Telecentris, an IP phone system and technology company, for approximately three-and-a-half years.

15. On January 1, 2015, Mr. Feller commenced providing consulting services to Telecentris and served on the Telecentris board of directors as the appointee and acting on behalf of Cronus Equity.

16. The Telecentris Consulting Agreement provided for compensation to Cronus Equity of $10,000 per month, with a term of 12 months with annual auto renewal unless 90 days written notice was provided.

17. The Telecentris Consulting Agreement renewed at least 3 to 4 times until Mr. Feller resigned.

18. Cronus Equity was paid $10,000 a month each and every month while the Telecentris Consulting Agreement was enforced.

19. The Telecentris Consulting Agreement provided that Mr. Feller/Cronus Equity LLC would receive a million shares of the company stock earned over three years with automatic renewals.

27

20. Brian Hertz, who sat on the Sky Digital Media Group board, communicated to Mr. Feller that Mr. Hertz had been contacted by Mr. Petty threatening legal action against the Telecentris board of directors unless Mr. Feller was removed.

21. In March or April 2018, Mr. Feller resigned from the Telecentris board of directors and released his compensation of the Telecentris shares as part of the settlement.

22. Mr. Feller understood the reason he was terminated from the Telecentris board was due to concerns of Telecentris board members that the company could be sued because of statements made to Telecentris by Mr. Petty about alleged wrongdoing by Mr. Feller.

23. At the time Mr. Feller resigned from the Telecentris board of directors, he had earned a million shares that vested up until that point. Mr. Feller testified he believes a million shares of Telecentris common stock was worth approximately $3 million on July 15, 2014.

24. The trial evidence did not establish that Mr. Petty knew of the Telecentris Consulting Agreement.

25. Because there is no evidence that Mr. Petty knew of the Telecentris Consulting Agreement, Plaintiffs have not met their burden to establish by a preponderance of evidence that Mr. Petty engaged in intentional interference with contractual relations.

26. Accordingly, judgment should be entered against Mr. Feller on his claim for intentional interference with contractual relations as to the Telecentric Consulting Agreement.

### *VOS/ Cronus Equity LLC Consulting Agreement*

27. VOS, Inc., a Nevada corporation, purportedly entered into a Consulting Agreement with Paul Feller/Cronus Equity as of October 10, 2015 (the "VOS/Cronus Contract").

28. Under the VOS/Cronus Contract, Paul Feller, through his company Cronus Equity LLC, was to provide consulting services to VOS in the areas of business development and fundraising on a best-efforts, first-priority basis. VOS was to pay Mr. Feller/Cronus

Equity $10,000 per month and a finder's fee of 8% in cash for services rendered to VOS under the VOS/Cronus Contract.

29.  Credible evidence at trial established that Mr. Petty was not aware of the VOS/Cronus Contract and never signed the document that purports to be the VOS/Cronus Contract. The Court found credible the evidence presented at trial that as of the date of the supposed VOS/Cronus Contract, Mr. Petty was the sole shareholder of VOS and did not sign or know of the VOS/Cronus Contract.

30. Indeed, the evidence presented at trial more convincingly suggested that Mr. Feller created the VOS/Cronus Consulting Agreement after the fact and the supposed agreement was neither signed nor agreed to by Mr. Petty.

31. Because there is no evidence that Mr. Petty knew of the VOS/Cronus Contract, Plaintiffs have not met their burden to establish by a preponderance of evidence that Mr. Petty engaged in intentional interference with contractual relations.

32. Accordingly, judgment should be entered against Mr. Feller on his claim for intentional interference with contractual relations as to the VOS/Cronus Contract.


**Intentional Interference with Prospective Economic Relations**


33. Under California law, the elements of a cause of action for intentional interference with prospective economic relations are: (1) an economic relationship between the plaintiff and another containing a probability of future economic benefit; (2) the defendant's knowledge of the existence of the relationship; (3) intentional acts by the defendant designed to disrupt the relationship; (4) actual disruption of the relationship; and (5) damages to the plaintiff proximately caused by the defendant's acts.

*Della Penna v. Toyota Motor Sales, U.S.A., Inc.*, 11 Cal. 4th 376, 389 (1995).  To prevail on a claim for the alleged intentional interference with prospective economic relations, a plaintiff must prove that "the defendant not only knowingly interfered with the plaintiff's expectancy,

but engaged in conduct that was wrongful by some legal measure other than the fact of interference itself." *Id.* at 393.

### *Telecentris*

34. With respect to Telecentris, the evidence at trial showed that an economic relationship existed between Plaintiffs and Telecentris. However, as discussed above, there was no evidence adduced at trial to show that Mr. Petty knew of any such economic relationship. The credible trial evidence only demonstrated that Mr. Petty knew Mr. Feller was a member of the board of directors of Telecentris.

35. Therefore, Plaintiffs failed to meet their burden to prove by a preponderance of the evidence that Mr. Petty intentionally interfered with any prospective economic relations between Mr. Feller and Telecentris.

### *VOS/Sky Media*

36. With respect to VOS, the evidence at trial established that Mr. Petty formed VOS as the sole founder in October 2015. When Mr. Petty first met Mr. Feller in January or February 2015, Mr. Feller was CEO of Sky Digital Media and Mr. Petty was a director of Sky Digital Media. Through an asset purchase, Mr. Petty purchased Sky Digital Media and it became part of VOS.

37. Mr. Feller and Mr. Petty had a verbal agreement in VOS, whereby Mr. Feller, through his company Cronus Equity LLC, would receive half of Mr. Petty's founding VOS common shares, and in exchange, Mr. Feller would focus on raising money for the company and Mr. Petty would focus on running the company. The Court found credible the evidence presented at trial that this 50/50 agreement was never formalized in a written agreement or confirmed by a board meeting.

38. By an assignment or transfer of 50 percent of Mr. Petty's shares, Mr. Petty gave Mr. Feller/Cronus Equity 1 million preference shares and 4.25 million common shares in VOS.

39. From 2015 to 2017, there were only two directors at VOS, Mr. Petty and Mr. Feller.

40. Thus, the trial evidence established an economic relationship between Plaintiffs and Sky Digital Media with the probability of economic benefit to Mr. Feller/Cronus Equity and Mr. Petty's knowledge of that relationship.

41. The evidence at trial established Mr. Petty's actions in bringing to the attention of Sky Media board members and shareholders conduct by Mr. Feller/Cronus Equity LLC that Mr. Petty believed to be dishonest. Mr. Petty also made efforts to report his concerns to regulatory agencies, local law enforcement, the FBI, and the SEC, and Mr. Petty's actions caused Mr. Feller to be removed as CEO of Sky Media.

42. Nonetheless, the Court finds credible and compelling the evidence offered at trial that Mr. Feller's reputation was already poor. Mr. Feller had previously been accused of improperly taking $640,000 from another company, Status Media, and was later sued by Stratus Media; Mr. Feller had filed for personal bankruptcy in 2016 but had not disclosed that information in the subscription agreement for the VOS share offerings; a federal court found Mr. Feller's 2016 bankruptcy filing to have been made in bad faith; Mr. Feller had unilaterally diverted VOS investor funds from VOS's bank account to the Cronus Equity bank account; and Mr. Feller had made unauthorized sales of 2.5 million of Mr. Petty's VOS shares when Mr. Petty only authorized Mr. Feller to sell 1 million shares.

43. Thus, the evidence credibly established that Mr. Petty was a fiduciary of VOS and, in bringing these facts about Mr. Feller's conduct to the attention of the Sky Media directors and shareholders, as well as law enforcement and regulatory agencies, Mr. Petty was exercising his fiduciary responsibilities as VOS founder, director and Sky Media shareholder.

44. Under settled California law, Plaintiffs have failed to demonstrate that Mr. Petty's conduct was "wrongful by some legal measure other than the fact of interference itself." *Della Penna v. Toyota Motor Sales, U.S.A., Inc*., 11 Cal. 4th at 393. Mr. Petty cannot be liable for intentional interference with Mr. Feller's interest in the Sky Media consulting contract.

45. Further, even if Plaintiffs could establish legal liability on this claim, the evidence at trial indisputably established that Plaintiffs have not been harmed. Mr. Feller testified that Cronus Equity currently owns slightly more than 4.25 million shares of VOS common stock and Cronus Equity also owns 1 million shares of VOS preferred stock, which Mr. Feller himself valued at no less than $3 per share, for an estimated total value of at least $15 million.

46. Accordingly, Mr. Feller's claim fails and judgment should be entered against Plaintiffs on Plaintiffs' claim for intentional interference with contractual relations.

**Negligent Interference with Prospective Economic Relations**

47. To establish a claim for negligent interference with prospective economic relations, Plaintiffs had to show (1) that Plaintiffs and Mr. Petty were in an economic relationship that probably would have resulted in a future economic benefit to Plaintiffs; (2) that Defendant knew or should have known of this relationship; (3) that Defendant knew or should have known that this relationship would be disrupted if he failed to act with reasonable care; (4) that Defendant failed to act with reasonable care; (5) that Defendant engaged in wrongful conduct by accusing Mr. Feller of illegally diverting VOS investor funds into the account of his own company Cronus Equity LLC and effectuating unauthorized sales of 1.5 million of Mr. Petty's VOS shares; (6) that the relationship was disrupted; (7) that Plaintiffs were harmed; and (8) that Defendant's wrongful conduct was a substantial factor in causing Plaintiffs' harm. CACI 2204.

48. Further, the California Court of Appeal has emphasized that a "defendant incurs liability for interfering with another's prospective economic advantage only if the defendant's conduct was independently wrongful." *Venhaus v. Shulyz*, 155 Cal. App. 4th 1072, 1077-78 (2007).

49. Based on the same evidence outlined above with respect to Plaintiffs' claim for intentional interference with prospective economic relations, Plaintiffs fail to meet their burden of proof to establish liability against Mr. Petty for negligent interference with prospective economic relations.

**Injunctive Relief**

50. Injunctive relief is an equitable remedy available only when a plaintiff establishes there is no adequate remedy at law. *Sonner v. Premier Nutrition Corp*, 971 F.3d 834, 844 (9th Cir. 2020) (holding "the traditional principles governing equitable remedies in federal courts, including the requisite inadequacy of legal remedies, apply even when a party seeks [to recover under California statutes] in a diversity action").

51. At the start of trial Plaintiffs indicated that they had abandoned this claim. Nevertheless, Plaintiffs' Amended Memorandum of Contentions of Fact and Law includes a claim for injunctive relief. (*See* Dkt. No. 192 at 8-9.)

52. Even if Plaintiffs did not abandon this claim, Plaintiffs never sought a preliminary injunction and the trial evidence clearly established that there is an adequate remedy at law, i.e., monetary damages, available for each of the claims asserted against defendant, if proven.

53. Accordingly, Plaintiffs fail to establish they are entitled to any injunctive relief in this case.

\\
\\

## Defendant's Counterclaims

### *Breach of Fiduciary Duty*

54. To succeed on a breach of fiduciary duty claim in California, a plaintiff must establish the existence of a fiduciary relationship, breach of that duty, and damages. *Charnay v. Cobert*, 145 Cal. App. 4th 170, 182 (2006). The existence of a fiduciary relationship, giving rise to a fiduciary duty, is a question of law. *Marzec v. Public Employees Retirement System*, 236 Cal. App. 4th 889, 915 (2015). California courts have defined a "fiduciary relationship" as:

> any relation existing between parties to a transaction wherein one of the parties is duty bound to act with the utmost good faith for the benefit of the other party. Such a relation ordinarily arises where a confidence is reposed by one person in the integrity of another, and in such a relation the party in whom the confidence is reposed, if he voluntarily accepts or assumes to accept the confidence, can take no advantage from his actions relation to the interest of the other party without the latter's knowledge or consent."

*Wolf v. Sup. Court,* 107 Cal. App. 4th 25, 29 (2003) (citing Restatement Third of Agency, § 8.01). "California law clearly recognizes that officers and directors owe a fiduciary duty to stockholders and controlling stockholders owe a fiduciary duty to minority stockholders." *Small v. Fritz Companies, Inc*, 30 Cal. 4th 167, 179 (2003).

55. The evidence at trial established that Mr. Petty, as founder of VOS and the larger shareholder at Sky Digital Media, trusted and authorized counter defendants—Mr. Feller, acting through his own company, Cronus—to serve as Mr. Petty's agent in the sale of 1 million shares of VOS common stock.

56. From 2015 to 2018, Mr. Feller and Mr. Petty were the only directors of VOS.

34

57. The uncontested evidence at trial established that Mr. Feller and Mr. Petty were to be equal, 50-50, partners in VOS.

58. Mr. Feller owed a fiduciary duty to Mr. Petty as an officer and director of VOS.

59. Mr. Feller, acting individually and/or through Cronus, breached that duty by making unauthorized sales of 2.5 million shares of Mr. Petty's VOS stock when Mr. Petty only authorized the sale of 1 million shares.

60. The Court found credible the evidence presented at trial that Mr. Petty only signed two stock transfer agreements for the sale of 1 million of his VOS shares and that the signatures purporting to be Mr. Petty's signature on the stock transfer agreements for the sale of an additional 1.5 million shares of Mr. Petty's VOS stock were fraudulent.

61. Mr. Petty was damaged by Mr. Feller's breach of fiduciary duty by the loss of the 1.5 million shares of VOS stock.

62. Mr. Feller breached his fiduciary duty to Mr. Petty, the founder of VOS, by forcing Mr. Petty out of VOS and retaining control of all of VOS's funds in a Cronus Equity LLC bank account, and keeping VOS strapped for cash while purporting to make "loans" to VOS with the very funds that were specifically solicited from investors for VOS operations.

63. Mr. Feller breached his fiduciary duty to Mr. Petty by asserting that Mr. Petty, the founder of VOS, is not a VOS shareholder and never held any shares in VOS, despite unequivocal statements to the contrary in the Private Placement Memoranda provided to potential VOS investors.

64. Mr. Feller breached his fiduciary duty by creating fraudulent documents to assist in Mr. Feller's takeover of VOS and the ouster of Mr. Petty. The Court found credible the evidence at trial that: (1) Mr. Feller improperly transferred $175,000 of funds paid by Christopher Virtue for an investment in VOS from VOS's Chase Bank account into the Cronus Equity LLC bank account; (2) Mr. Feller created a fraudulent VOS/Cronus Consulting Agreement that Mr. Petty never signed (Ex. 21); and (3) Mr. Feller altered email exchanges between Mr. Petty and Mr. Feller to serve Mr. Feller's own ends.

65. Mr. Petty was damaged by Mr. Feller's breach of fiduciary duty.

66. Mr. Petty's damages as a result of Mr. Feller's breach of fiduciary duty include: (1) the monetary value of the loss of 1.5 million VOS common shares, which, if valued at $1/share would be valued at $1.5 million; and (2) the economic value of Mr. Petty's loss of control of the company he founded.

67. Accordingly, Mr. Petty has established by a preponderance of the evidence that Mr. Feller is liable for breach of fiduciary duty.

68. Compensable damages are awarded to Mr. Petty, to be paid by counter-defendants, in the amount of $1.5 million, representing the value of the unauthorized 1.5 million shares of VOS common shares sold.

69. The trial evidence regarding any monetary valuation for the loss of control of VOS, the company that that Mr. Petty founded, was not sufficiently specific or supported to enable the Court to make a finite damages award.  Therefore, the Court declines to award monetary damages for this category of harm.

70. Accordingly, judgment should be entered in Mr. Petty's favor on his counterclaim for breach of fiduciary duty and the Court awards total damages in the amount of $1.5 million.

***Accounting***

71. An accounting cause of action is equitable.  Under California law, an action for an accounting "is a proceeding in equity for the purpose of obtaining a judicial settlement of the account of the parties in which proceeding the court will adjudicate the amount due, administer full relief and render complete justice." *Verdier v. Sup. Court in and for City and County of San Francisco*, 88 Cal. App. 2d 527, 531 (1948).  An accounting "may be sought where the accounts are so complicated that an ordinary legal action demanding a fixed sum is impracticable. *Flores v. EMC Mortg. Co.*, 997 F. Supp. 2d 1088, 1120 (E.D. Cal. 2014) (*citing Civic Western Corp. v. Zila Industries, Inc.*, 66 Cal.

App. 3d 1, 14 (1977).  An action for accounting will not lie where there is an adequate remedy at law or where the sum that a plaintiff seeks to recover is a sum certain.  *Id.* at 1120 (internal citation omitted).  *An accounting is a remedy and not a cause of action. See Schaffer Family Investors, LLC v. Sonnier,* 120 F.Supp.3d 1029, 1049 (C.D. Cal. 2015) (internal citations omitted)*.*

72. The trial evidence raised questions as to whether there was a unity of interest between counter-defendants Mr. Feller and Cronus Equity LLC.  The evidence also established that the financial relationship between counter-defendants is unclear.  But, Mr. Petty did not assert alter ego as a basis for liability in his Counterclaim and the Final Pre-Trial Order did not refer to, or make any suggestion of, Cronus as being potentially liable for any breach of fiduciary duty.  (*Id.*)  Therefore, alter ego liability was not among the issues for determination at trial.

73. Accordingly, counterclaimant Mr. Petty cannot prevail on his counterclaim for an accounting and judgment shall be entered against Mr. Petty on his claim for an accounting.

***Conversion***

74. Conversion is the wrongful exercise of dominion over the property of another.  *Los Angeles Federal Credit Union v. Madatyan*, 209 Cal. App. 4th 1383, 1387 (2012); *and see* CACI 2100.  Under California law, conversion is a strict liability tort, where "[t]he foundation of the action rests neither in the knowledge nor the intent of the defendant." *Welco Electronics, Inc. v. Mora*, 223 Cal. App. 4th 202, 208 (2014).  To prevail on a claim for conversion, a party must establish: (1) ownership or right to possession of the property; (2) conversion by a wrongful act or disposition of property rights; and (3) damages.  CACI 2100.

75. Counterclaimant Mr. Petty demonstrated by credible evidence that he held an ownership and right of possession in 2.5 million common shares in VOS.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

76. The Court found credible Mr. Petty' trial testimony that Mr. Petty asked Mr. Feller to sell 1 million shares of Mr. Petty's VOS shares.

77. In order to execute the sale of 1 million shares of his VOS common shares, Mr. Petty signed only two (2) stock transfer agreements, each for 500,000 shares for a total sale of 1 million shares.

78. The trial evidence showed that contrary to Mr. Petty's authorization, Mr. Feller through Cronus Equity LLC, in fact, sold 2.5 million shares of Mr. Petty's VOS common shares by creating fraudulent stock transfer agreements and forging Mr. Petty's signature on the fraudulent stock transfer agreements.

79. The evidence established that Mr. Petty never consented to the sale of more than 1 million common shares of VOS stock and never authorized Mr. Feller to sell an additional 1.5 million VOS shares that belonged to Mr. Petty.

80. The Court found credible the evidence that Mr. Petty only signed two (2) stock transfer agreements for the sale of 1 million of his VOS shares.

81. The trial evidence demonstrated that through unauthorized sales using fraudulent stock transfer agreements, Mr. Feller engaged in a wrongful disposition of Mr. Petty's 1.5 million VOS common shares and retained the sale proceeds.

82. Mr. Petty is entitled to damages equal to the value of the 1.5 million VOS common shares that counter-defendants unlawfully sold.  Mr. Feller testified that the VOS common shares are worth $3 per share *if there was a public market* for the shares.  NO evidence at trial indicated the existence of a public market for the shares.  Thus, the $3.00 per share price was wholly speculative.  But the trial evidence did establish that Mr. Feller consummated sales of VOS shares at $1 per share and captured those funds through deposits funneled directly into the Feller-controlled Cronus accounts.

83.     California Civil Code Section 3336 provides two methods to properly calculate damages for conversion of personal property:

The detriment caused by the wrongful conversion of personal property is presumed to be:

> First – the value of the property at the time of the conversion, with the interest from that time, or, an amount sufficient to indemnify the party injured for the loss which is the natural, reasonable and proximate result of the wrongful act complained of and which a proper degree of prudence on his part would not have averted; and
>
> Second – A fair compensation for the time and money properly expended in pursuit of the property.

Cal. Civ. Code § 3336.

84. Counterclaimant Mr. Petty showed by a preponderance of evidence that he has been damaged by counter-defendants' wrongful sale of 1.5 million shares of Mr. Petty's VOS common stock.

85. Therefore, the Court finds a $1 per share valuation to be consistent with the credible, unchallenged trial evidence based on actual transactions with third party investors.

86. Applying the measure of damages provided by California Civil Code Section 3336, the Court awards Petty damages in the amount of $1.5 million for conversion of 1.5 million VOS common shares that Feller fraudulently sold.

87. The uncontroverted trial evidence also established the $900,000 in VOS funds that were deposited directly into the Cronus bank account and, therefore, made unavailable to support VOS operations. Petty is not entitled to any damages based on the loss of these funds because this money, even if improperly seized by Feller through Cronus, was the property of non-party VOS, not Petty, and no evidence presented at trial established or suggested otherwise. VOS asserted no claims on its own behalf in this action.

88. Accordingly, judgment should be entered in favor of counterclaimant Mr. Petty on his counterclaim for conversion of the VOS shares, and Mr. Petty is entitled to an award of damages in the amount of $1.5 million.

89. Mr. Feller effectuated the conversion of Mr. Petty's VOS shares through the mechanism of Mr. Feller's controlled company, Cronus Equity. Therefore, the Court finds both

1
2
counter-defendants jointly and severally liable for the damages caused by Mr. Feller's
actions.

3
4
5
6
7
8
9
90. However, where a plaintiff seeks damages from a defendant(s) under more than one
legal theory, each item of damages may be awarded only once, regardless of the number
of legal theories alleged. CACI 3934. Therefore, the Court declines to award any
additional damages for the conversion counterclaim as the damages for this claim are
duplicative of damages already awarded in connection with counterclaimant's breach of
fiduciary duty claim.

10
11
***Fraud and Deceit***

12
13
14
15
16
91. The elements of fraud that give rise to a tort action for deceit are: (1) a misrepresentation;
(2) with knowledge of its falsity; (3) with the intent to induce another's reliance on the
misrepresentation; (4) justifiable reliance; and (5) resulting damage. *Small v. Fritz
Companies, Inc.,* 30 Cal. 4th 167, 173 (2003); see also *Bily v. Arthur Young & Co.,* 3
Cal. 4th 370, 401 (1992).

17
18
19
20
21
92. The trial evidence established that Mr. Feller made fraudulent representations to, or
concealment from, counterclaimant Mr. Petty in connection with the unauthorized sale
of 1.5 million shares of VOS common stock to investors. Specifically, Mr. Feller
misrepresented that Mr. Petty consented to the sale of 1.5 million shares of VOS
common stock.

22
23
24
25
93. Substantial evidence demonstrated that Mr. Feller knew that his representations to Mr.
Petty regarding the sale of Mr. Petty's VOS shares were false and that Mr. Feller's
representations were made with the express intent to induce Mr. Petty's reliance on the
misrepresentation.

26
94. Mr. Petty relied upon Mr. Feller's misrepresentations.

27
28
95. Mr. Petty suffered the loss of 1.5 million VOS shares through the unauthorized sale of
these shares to investors solicited by Mr. Feller valued at $1.5 million, and was never

40

compensated for those shares for total compensatory damages on this claim of $1.5.
million.

96. Therefore, the Court concludes that counterclaimant Mr. Petty has met his burden to
establish by a preponderance of the evidence that counter-defendants Feller/Cronus
Equity are liable for fraud and deceit.

97. Therefore, judgment should be entered in counterclaimant Mr. Petty's favor on his
counterclaim for fraud and deceit.

98. Here, too, counterclaimant's damages are duplicative of the $1.5 million in damages to
be awarded for conversion.  No evidence was adduced at trial of any other item of
damages arising from the unauthorized sale of Mr. Petty's VOS common shares.  Where
a plaintiff seeks damages from a defendant or defendants under more than one legal
theory, each item of damages may be awarded only once, regardless of the number of
legal theories alleged.  CACI 3934.  Therefore, the Court declines to award any
additional damages for the fraud and deceit counterclaim as the damages alleged are
duplicative of the damages awarded in connection with counterclaimant's breach of
fiduciary duty and conversion claims.

***Negligent Misrepresentation***

99. "The tort of negligent misrepresentation, [is] a species of the tort of deceit." *Conroy v.
Regents of University of California*, 45 Cal. 4th 1244, 1255 (2009).  The elements of a
negligent misrepresentation claim are: (1) the misrepresentation of a past or existing
material fact; (2) without reasonable ground for believing it to be true; (3) with intent to
induce another's reliance on the misrepresented fact; (4) justifiable reliance on the
misrepresentation; and (5) resulting damage.

100.    The trial evidence discussed above with respect to counterclaimant's claim for
fraud and deceit is also sufficient to establish Mr. Feller's liability for negligent
misrepresentation.

101.     Accordingly, judgment should be entered in favor of counterclaimant Mr. Petty on his claim for negligent misrepresentation.

102.     But once again, the damages counterclaimant seeks for the negligent misrepresentation counterclaim are identical to the damages awarded for conversion and no evidence was adduced at trial of any other item of damages arising from Mr. Feller's negligent misrepresentation.  *See* CACI 3934.  Consequently, the Court declines to award additional damages for the negligent misrepresentation counterclaim as the damages arising from this claim are duplicative of the damages awarded in connection with counterclaimant's breach of fiduciary duty and conversion counterclaims.

### *Fraudulent Transfer*

103.     Counterclaimant Mr. Petty's claim for fraudulent transfer seeks to "claw back" from third party investors the proceeds of the unauthorized sale of 1.5 million of Mr. Petty's VOS common shares, pursuant to Cal. Civ. Code § 3439 et seq.  (*See* Counterclaim of Defendant Robert Petty, at ¶¶ 35-40 [dkt. no. 31].)

104.     California's Uniform Fraudulent Transfer Act (CUFTA) (Cal. Civ. Code § 3439.05(a)(1); *and see* Cal. Civ. Code § 3440[2]) provides that "a transfer of assets made by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer, if the debtor made the transfer (1) with an actual intent to hinder, delay or defraud any creditor, or (2) without receiving reasonably equivalent value in return, and either (a) was engaged in or about to engage in a business or transaction for which the debtor's assets were unreasonably small, or (b) intended to, or reasonably believed, or reasonably should have believed, that he or she would incur debts beyond his or her

---

[2] Cal. Civ. Code § 3440 states, in relevant part, "[E]very transfer of personal property made by a person having at the time the possession of the property, and not accompanied by an immediate delivery followed by an actual or continued change of possession of the property, is void as against the transferor's creditors (secured or unsecured) at the time of the transfer and those who become creditors while the transferor remains in possession and the successors in interest of those creditors, and as against buyers from the transferor for value in good faith subsequent to the transfer."

1    ability to pay as they became due." *Monastra v. Konica Bus. Machines, U.S.A., Inc.*, 43

2    Cal. App. 4th 1628, 1635 (1996) (internal citations omitted).

3    105.    In determining the issue of actual intent, the CUFTA instructs that courts may

4    consider whether the transfer or obligation was to an insider; whether the debtor retained

5    possession or control of the property transferred after the transfer; whether the transfer

6    or obligation was disclosed or concealed; whether before the transfer was made or

7    obligation was incurred, the debtor had been sued or threatened with suit; whether the

8    debtor absconded; whether the debtor removed or concealed assets; whether the value

9    of the consideration received by the debtor was reasonably equivalent to the value of the

10   asset transferred or the amount of the obligation incurred; whether the debtor was

11   insolvent or became insolvent shortly after the transfer was made or the obligation was

12   incurred; whether the transfer occurred shortly before or shortly after a substantial debt

13   was incurred; and whether the debtor transferred the essential assets of the business to a

14   lienor that transferred the assets to an insider of the debtor.  A creditor making a claim

15   for fraudulent transfer under CUFTA has the burden of proving the elements of the claim

16   for relief by a preponderance of the evidence.  Cal. Civ. Code § 3439.04(b).

17   106.    Here, counterclaimant Mr. Petty seeks to set aside, as fraudulent transfers, the

18   unauthorized sale of 1.5 million of his VOS shares that counter-defendant Mr. Feller

19   sold to various investors, including family members and associates of Brian

20   Giammarella, without Mr. Petty's knowledge or consent.

21   107.    Substantial trial evidence established that: (a) counter-defendants Feller/Cronus

22   Equity LLC received the proceeds of the unauthorized sales of VOS common shares;

23   (b) as the owner of the 1.5 million shares of VOS common shares, counterclaimant Mr.

24   Petty's right to payment from counter-defendants for the 1.5 million common shares in

25   VOS arose prior to the unauthorized VOS share transfers because Mr. Petty's ownership

26   interest in the VOS shares pre-dated the unauthorized sales of those shares; and (c)

27   counterclaimant Mr. Petty never received any compensation from the unauthorized sale

28   of  his 1.5 million VOS common shares.

43

108.     However, counterclaimant Mr. Petty has not proven by a preponderance of the evidence that counter defendants were "debtors" within the meaning of the statute or that the assets in question, Mr. Petty's 1.5 million VOS common shares, were sold with actual intent to hinder, delay, or defraud any creditor of a debtor.  The trial evidence does not support a finding that Mr. Feller/Cronus and Mr. Petty were in a debtor/creditor relationship with respect to the unauthorized sale of Mr. Petty's 1.5 million VOS common shares.  Rather, the trial evidence established that Mr. Feller engaged in unadulterated theft.

109.     For reasons discussed above, the Court concludes that counterclaimant Mr. Petty has not proven by a preponderance of the evidence that the unauthorized transfer of the 1.5 million VOS common shares constituted a "fraudulent transfer" within the meaning of California Civil Code § 3440.

110.     Accordingly, judgment should be entered against counterclaimant Mr. Petty on his counterclaim for fraudulent transfer.

### *Securities Fraud*

111.     Under California law, "[i]t is unlawful for any person to offer or sell a security in this state, or to buy or offer to buy a security in this state, by means of any written or oral communication that includes an untrue statement of a material fact or omits to state a material fact necessary to make the statements made, in the light of the circumstances under which the statements were made, not misleading."  Cal. Corp. Code § 25401.

112.     California law includes a provision imposing secondary liability for securities fraud liability on

> "[e]very person who directly or indirectly controls a person liable under Section 25501   or 25503, every partner in a firm so liable, every principle executive officer or director of a corporation so liable, every person occupying a similar status or performing similar functions, every employee of a person so liable who

44

materially aids in the act or transaction constituting the violation, and every broker-dealer or agent who materially aids in the act or transaction constituting the violation, are also liable jointly and severally with and to the same extent as such person, unless the other person who is so liable had no knowledge or reasonable grounds to believe in the existence of the facts by reason of which the liability is alleged to exist."   Cal. Corp. Code § 25504.

113.    To prevail on a securities fraud claim under Section 25401, a party must prove by a preponderance of the evidence: (1) a sale or purchase of stock in California; (2) was made by fraudulent untrue statements or by omission of material facts that would, by the omission, make the statements misleading.  *See, e.g., MTC Elec. Tech. Co., Ltd. v. Lung*, 876 F. Supp. 1143, 1147 (C.D. Cal. 1995).

114.    Claims for primarily liability under Sections 25401 and 25501 require strict privity between buyer and seller. *Moss v. Kroner*, 197 Cal. App. 4th 860, 874 (2011). But California law does not require strict privity "for secondary liability suits alleging joint and several liability for a violation of section 25401 by means of section 25504 and/or 25504.1."  *Id.*; *see also Bains v. Moores*, 172 Cal. App. 4th 445, 479 (2009) (finding that if control person liability was properly alleged under § 25504, plaintiffs needed to plead that they purchased securities from the company that was alleged to be liable under § 25501, not that they purchased them from the defendants alleged to be secondarily liable).

115.    "Actual reliance occurs when the defendant's misrepresentation is an immediate cause of the plaintiff's conduct, altering his legal relations, and when absent such representation, the plaintiff would not, in all reasonable probability, have entered into the transaction. *Cadlo v. Owens-Illinois, Inc.*, 125 Cal. App. 4th 513, 519 (2004).

116.    The trial evidence established that counter-defendants Feller and/or Cronus offered to sell VOS securities to third-party investors in the state of California.

117.    Substantial evidence demonstrated that Counter-defendants Feller/Cronus made actual misrepresentations to VOS third-party investors that counterclaimant Robert

Petty had affirmatively agreed to the sale of 1.5 million of his VOS common shares, when the evidence showed that Mr. Petty neither knew of nor consented to the sale of these 1.5 million VOS common shares.

118.      The counter-defendants' representations were misleading and false.

119.      Credible trial evidence showed that counterclaimant Mr. Petty actually relied upon counter-defendant Mr. Feller's representations that he would sell only 1 million of Mr. Petty's VOS common shares, and relied on representations that counter-defendants would remit to Mr. Petty the full proceeds of the sale of Mr. Petty's VOS common shares.

120.      Furthermore, the trial evidence established that the sale of an additional 1.5 million of Mr. Petty's VOS shares to Brian Giammarelli and various members of his family and friends was wholly unauthorized.  However, there was no evidence adduced at trial to prove any privity between Mr. Feller and Mr. Petty in connection with those sales.

121.      Mr. Petty's counterclaim did not assert liability against Mr. Feller based on a theory of secondary liability.  Mr. Petty's Seventh Claim for Relief in his Answer and Counterclaim generally asserted a claim for "securities fraud" based on Cal. Corp. Code Section 25501.  But, the Final Pre-Trial Order, as adopted and entered by the Court, did not assert any statutory basis for alleged securities fraud against Mr. Feller.  (*See* Dkt. No. 196 at 14.)[3]  Pursuant to Federal Rule of Civil Procedure 16(e), the Final Pre-Trial Order supersedes all prior pleadings and "controls the subsequent course of action in the litigation unless it is modified by a subsequent order." *Eagle v. American Tel. & Tel. Co.*, 769 F.2d 541, 548 (9th Cir. 1985).  "[A] theory will be barred if not at least implicitly included in the order." (*Id.* (citing *United States v. First Nat'l Bank of Circle*, 652 F.2d 882, 886 (9th Cir. 1981).)

---

[3] The Final Pre-Trial Conference Order was signed nunc pro tunc until after trial.  But the Court stated at the January 19, 2023 Final Pre-Trial Conference that "the parties' proposed Final Pre-Trial Conference Order is accepted without amendment and will be entered by the Court."  (Dkt. No. 163.)

122.     Accordingly, Mr. Feller and Cronus Equity LLC are not liable to Mr. Petty for securities fraud and Mr. Petty is not entitled to any damages on this counterclaim.

**_Breach of Contract_**

123.      To establish liability for a claim for breach of contract, a party must prove: (1) the existence of a contract; (2) the parties to the contract: (3) plaintiff's performance under the contract or excuse for nonperformance; (4) defendant's breach; and (4) damages to plaintiff directly caused by the breach.

124.     Counterclaimant Mr. Petty entered into various agreements with Mr. Feller.  As an initial matter, the trial evidence established that the 50/50 agreement regarding VOS was oral and provided that Mr. Feller would raise capital and Mr. Petty would run the company.  It was undisputed at trial that this agreement was never reduced to a writing. California Civil Code section 1622 provides that "all contracts may be oral except such as are specially required by statute to be in writing."  Cal. Civ. Code § 1622.  The parties presented no evidence at trial of any statute requiring the 50/50 agreement to be in writing.

125.     Credible evidence presented at trial showed that Mr. Feller breached the agreement by failing to raise any capital for VOS consistent with the unwritten agreement with Mr. Petty.  No evidence was adduced at trial that Mr. Feller's failure to perform was excused.

126.     The evidence showed that Mr. Petty, on the other hand, performed under the agreement by managing the business of VOS and trusting that Mr. Feller would fulfill his end of the agreement.  Credible evidence also demonstrated that by ceding 50% of his initial common shares in VOS to Mr. Feller/Cronus and getting nothing in return, Mr. Petty was directly harmed by Mr. Feller's breach.  Testimony established that Mr. Petty's damages were the loss of 4,250,000 shares of VOS common stock and 1 million shares of preferred stock issued to Cronus Equity as consideration for the agreement.

127.    In his bankruptcy filing, Mr. Feller listed the value of the shares held by Cronus at $525,000 based on a value of $1 per share.

128.    Mr. Feller testified that *if* there was a public market for the common shares, valued at $3 per share, the VOS shares held by Cronus would be worth over $12 million. According to Mr. Feller's testimony, the VOS preferred stock is worth at least $3 per share, in other words, equal to the price of the common stock.  But, as noted above, Feller's estimated valuation is wholly speculative.   While a public offering could presumably increase the value of the shares, there was no evidence presented at trial that any public offering had yet occurred.  Thus, the total value of the loss to Mr. Petty of 4,250,000 shares of VOS common stock and 1 million preferred VOS shares held by Cronus in VOS Digital is $5,250,000.  This figure is based on uncontroverted trial evidence of Mr. Feller's own valuation of the shares at $1/share in his bankruptcy filing and his testimony that the value of the VOS preferred stock is equal to the price of the common stock.

129.    Consequently, counterclaimant Mr. Petty established each of the elements of a claim for breach of contract and judgment should be entered in favor of Mr. Petty and against counter-defendants on this counterclaim.

130.    The Court awards $5,250,000 million in compensatory damages for harm to counterclaimant directly caused by counter-defendants' breach of contract.

### *Punitive Damages*

131.    Counterclaimant Mr. Petty seeks punitive damages against counter-defendants Mr. Feller and/or Cronus Equity LLC.

132.    Evidence of a defendant's financial condition is a legal precondition to the award of punitive damages. *Farmers & Merchants Trust Co. v. Vanetik*, 33 Cal. App. 5th 638, 648 (2019).

48

133.    The California Supreme Court has not prescribed any specific standard for assessing a defendant's ability to pay punitive damages, "but it has held that actual evidence of the defendant's financial condition is essential." *Id.* "A plaintiff seeking punitive damages must provide a balanced overview of the defendant's financial condition; a selective presentation of financial condition evidence will not survive scrutiny." *Id.* at 615 (*citing Baxter v. Peterson*, 150 Cal. App. 4th 673, 676 (2007)).

134.    This action was commenced 2018, the trial was continued no fewer than five times, and the parties have had fulsome opportunities to conduct discovery, and present evidence and witnesses over the course of the six-day bench trial. Nevertheless, counterclaimant Mr. Petty did not present evidence, including with respect to Mr. Feller and/or Cronus Equity LLC's financial condition, including liabilities, sufficient to permit the Court to make an adequate assessment of counter-defendants' ability to pay an award of punitive damages.

135.    Consequently, the Court finds that sufficient evidence does not support counterclaimant's request for an award of punitive damages against counter-defendants.

**III**

**CONCLUSION**

**Plaintiffs' Claims**

For the reasons outlined above, the Court finds against Plaintiffs Paul Feller and Cronus Equity LLC on their claims for defamation; civil extortion; intentional interference with contractual relations; intentional interference with prospective economic relations; negligent interference with prospective economic relations; and for injunctive relief. Plaintiffs shall recover nothing on these claims.

1

2

**Defendant's Counterclaims**

3

4

      As to defendant and counterclaimant Robert Petty's counterclaims, the Court finds

5

counter-defendants Paul Feller and Cronus Equity LLC liable on Mr. Petty's counterclaims for

6

breach of fiduciary duty, conversion, fraud and deceit, negligent misrepresentation, securities

7

fraud, and breach of contract. The Court finds against counterclaimant Mr. Petty on the

8

counterclaim for fraudulent transfer. The Court awards total compensatory damages of

9

$6,750,000 against counter defendants for breach of fiduciary duty, fraud and deceit,

10

conversion, negligent misrepresentation, and breach of contract

11

      Further, the Court finds that counterclaimant's claims for an accounting, securities

12

fraud, and the request to recover litigation costs as an element of compensatory damages, all

13

fail as a matter of law. The Court declines to award punitive damages.

14

15

      LET THE SECOND AMENDED JUDGMENT BE ENTERED ACCORDINGLY.

16

17

DATE: August 29, 2024

18

19

             KAREN L. STEVENSON
             CHIEF U.S. MAGISTRATE JUDGE

20

21

22

23

24

25

26

27

28